UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *  Criminal No.14-cr-10190-IT |
| STEPHEN GOUDREAU, | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

April 7, 2015

TALWANI, D.J.

I.  Introduction

A federal grand jury indicted Defendant Stephen Goudreau as a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Goudreau now moves to suppress a gun and ammunition that officers found in a duffle bag. Goudreau contends that the warrantless search violated his Fourth Amendment rights. After an evidentiary hearing, the court finds that the search was not justified as a search incident to arrest or by exigent circumstances. The search was nonetheless permissible as Goudreau gave his voluntary consent for the officers to search the duffle bag. Accordingly, the court denies Goudreau's Motion to Suppress [#35].

II. Factual Findings

On March 4, 2014, officers from the Ipswich Police Department and Special Agent Daniel McPartlin of the Bureau of Alcohol, Tobacco, and Firearms responded to a reported theft of firearms from Patriot Arms of New England—a firearms store co-owned by Richard Munyon ("Munyon") and John Goudreau, Stephen Goudreau's father. Hr'g Tr. 6-7 [#51]; Aff. Dziadose ¶ 2 [#35-2]. The officers went to the store and spoke with Munyon and John Goudreau. Hr'g Tr. 6-7; Aff. Dziadose ¶ 2. Munyon told the officers that on Friday, February 28, 2014, he noticed

that a gun was missing from the store. Hr'g Tr. 7; Aff. Dziadose ¶ 2. Munyon reported that he and John Goudreau conducted an inventory of the store over the weekend and noticed that a second gun was missing as well. Hr'g Tr. 7; Aff. Dziadose ¶ 2. Munyon told the officers that on Monday, March 3, 2014, he viewed the surveillance video of the store from the previous Friday and saw Stephen Goudreau stand near the gun storage area, tuck something under his shirt, and walk towards the garage in the rear of the building. Hr'g Tr. 7; Aff. Dziadose ¶ 2. Munyon told the officers that after viewing the surveillance video, he went to the garage, where he found two empty gun boxes. Hr'g Tr. 8; Aff. Dziadose ¶ 2.

John Goudreau told the officers that he had contacted Stephen Goudreau by text message and he showed the officers Stephen Goudreau's response. Hr'g Tr. 8; Aff. Dziadose ¶ 2. The officers photographed the text messages on John Goudreau's phone. Hr'g Ex. 1. Stephen Goudreau messaged, among other things:

> Dad I know I f*ed up and im sorry[.] . . . [P]lease don't think I wanted to do this[.] . . . I did something 3yrs ago with someone he got arrested I got away[.] . . . [W]hen I said I couldnt get the cash he said to get guns[.] [T]hey know u have a store and I might be able to get them[.] . . . [I']m so sorry either way im going to jail the federal pen cause I stole from u or state prison cause of the past crime.

Hr'g Ex. 1. Munyon told the officers that he and John Goudreau gave Stephen Goudreau a deadline of 10:00 a.m. on Tuesday, March 4, 2014, to return the guns or they would call the police. Aff. Dziadose ¶ 2. According to Munyon, when Stephen Goudreau did not respond by noon, Munyon called the police. Aff. Dziadose ¶ 2.

On March 5, 2014, officers applied for and obtained a search warrant to determine the location of Stephen Goudreau's (hereinafter "Goudreau") cell phone by its GPS signal. Hr'g Tr. 12; Aff. Dziadose ¶ 3. Based on the GPS signal, officers determined that Goudreau's cell phone was located at or near 194 Nesmith Street, Lowell, Massachusetts, the residence of Sarah Levoy (who the officers suspected to be Goudreau's girlfriend). Hr'g Tr. 12; Aff. Dziadose ¶ 3-4.

Agent McPartlin also reviewed Goudreau's criminal history and saw that Goudreau had at least six felony convictions, including one for assault and battery. Hr'g Tr. 11. Officers then applied for and obtained an arrest warrant for Goudreau and a search warrant for 194 Nesmith Street, Apartment 6 for "the person known as Stephen Goudreau." Hr'g Tr. 13.

Agent McPartlin testified that on March 5, 2014, at around 11:00 p.m., he and seven other officers went to 194 Nesmith Street. Hr'g Tr. 14, 35. Upon arrival, two officers initially remained outside and the other six officers entered a staircase that lead to Apartment 6. Hr'g Tr. 14-16, 42. Sergeant Joe Murray knocked on the apartment door and said "police." Hr'g Tr. 15. Sergeant Murray waited for a count of five, knocked again, and said "police." Hr'g Tr. 15. Sergeant Murray indicated that he heard movement inside the apartment and he then kicked open the door, damaging it. Hr'g Tr. 15, 38. The officers entered the apartment. Hr'g Tr. 15. The lights in the apartment were initially off. Hr'g Tr. 38. Upon entering the apartment, Agent McPartlin saw Goudreau and Ms. Levoy in bed in a bedroom located to the left of the door. Hr'g Tr. 15. The officers commanded: "Let's see your hands." Hr'g Tr. 15, 40. Four officers entered the bedroom with their guns drawn and ordered Goudreau to get on the ground. Hr'g Tr. 40. The remaining officers conducted a sweep of the apartment for persons and found no one else present. Hr'g Tr. 16. Officers escorted Ms. Levoy out of the bedroom and into the kitchen. Hr'g Tr. 16-17, 41.

Inside the bedroom, where four officers were present, two officers participated in securing Goudreau. Supp. Hr'g Tr. 13 [#53]. The officers handcuffed Goudreau's hands behind his back while he was on the ground. Hr'g Tr. 15; Supp. Hr'g Tr. 14. Goudreau was initially agitated, asked what was going on, and asked to see a search warrant. Hr'g Tr. 15, 44-45. The officers did not respond to Goudreau's questions because, according to Agent McPartlin,

3

Goudreau was not yet under control. Hr'g Tr. 44-45. After Goudreau was handcuffed, the officers returned their guns to their holsters and searched Goudreau's person. Hr'g Tr. 23; Supp. Hr'g Tr. 27. Meanwhile, the two remaining officers in the room conducted a sweep of the room for persons and searched the sheets on the bed. Hr'g Tr. 43, 51; Supp. Hr'g Tr. 13, 14, 15-16.

The officers brought Goudreau to his feet. Hr'g Tr. 42. Goudreau stood with the back of his legs against the long side of the bed, near the middle, but slightly closer to the foot than the head of the bed. Supp. Hr'g Tr. 10, 13. One officer stood directly in front of Goudreau. Supp. Hr'g Tr. 12. Agent McPartlin stood at Goudreau's left side (closer to the head of the bed) and held Goudreau's left arm. Hr'g Tr. 19; Supp. Hr'g Tr. 11, 31. The two remaining officers in the room were "standing there" and "engaged with Goudreau," who was asking the officers why they were there and what was going on. Hr'g Tr. 18. At that point, the officer standing directly in front of Goudreau dropped his head, revealing a patch on his hat for the police department of Ipswich—the town in which Goudreau's father's gun store was located. Hr'g Tr. 15-16, 18; Supp. Hr'g Tr. 12-13. Goudreau then stated: "I know what this is about; it's in the bag," and gestured with his head towards the right and the foot of the bed. Hr'g Tr. 15-16, 18; Supp. Hr'g Tr. 12-13. There was a duffle bag on the floor at the foot of the bed. Hr'g Tr. 18. The duffle bag was zipped shut and located five to six feet from Goudreau. Hr'g Tr. 18; Supp. Hr'g Tr. 15, 19. An officer unzipped the duffle bag. Supp. Hr'g Tr. 15. Inside the duffle bag, the officer found a toiletry bag. Hr'g Tr. 47-48; Supp. Hr'g Tr. 15. The officer unzipped the toiletry bag and found a gun and ammunition inside. Supp. Hr'g Tr. 15.

III. <u>Discussion</u>

Goudreau seeks to suppress the gun and ammunition that officers found inside the toiletry bag. Goudreau contends that the search of the duffle and toiletry bags was not authorized by

4

either the arrest warrant or the search warrant, which authorized the officers to search the apartment only for "the person known as Stephen Goudreau." Goudreau asserts that the officers' warrantless search of the bags violated his Fourth Amendment rights. Searches conducted without a warrant "are *per se* unreasonable under the Fourth Amendment," subject to only a few well-delineated exceptions. Arizona v. Gant, 556 U.S. 332, 338 (2009) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). The Government responds that the search was justified by three exceptions to the warrant requirement: (1) search incident to arrest, (2) exigent circumstances, and (3) consent. Alternatively, the Government asserts that, even if the search does not fall into one of the exceptions to the warrant requirement, application of the exclusionary rule is not appropriate in light of the inevitable discovery doctrine.

    *a. Search Incident to Arrest*

The Government contends that the officers' search of the duffle bag, as well as the toiletry bag located within the duffle bag, was justified because the bags were within Goudreau's immediate control "at the time of his arrest and prior to being handcuffed." Govt.'s Supp. Mem. 6 [#57]. Goudreau responds that, "at the time of the search," there was "no reasonable possibility" that he could have unzipped and reached into the bags with his hands cuffed behind his back and while surrounded by armed officers. Def.'s Post-Hr'g Mem. 6, 8 [#58].

    "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Gant, 556 U.S. at 338. "[P]olice may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" Id. at 335 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). The scope of a search incident to arrest must be "commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an

5

arrestee might conceal or destroy." Id. at 339. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search incident-to-arrest exception are absent and the rule does not apply." Id.; see also Chimel, 395 U.S. at 763 (reasoning that there is "ample justification" for searching for "[a] gun on a table or in a drawer in front of one who is arrested," but there is "no comparable justification . . . . for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself").

In Gant, the Supreme Court clarified that the "possibility of access"—that is, the possibility that an arrestee could access the area that the officers seek to search—is measured at the time that the search takes place. See Gant, 556 U.S. at 344 ("Because police could not reasonably have believed . . . that Gant could have accessed his car *at the time of the search . . .*, the search in this case was unreasonable." (emphasis added)); see also id. at 343 ("[W]e . . . hold that the Chimel rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment *at the time of the search*." (emphasis added)). Although Gant involved the search of a vehicle, the Court's reasoning does not provide a basis for limiting its "time of the search" rule to the vehicle context. See United States v. Shakir, 616 F.3d 315, 318 (3d Cir. 2010) ("[W]e do read Gant as refocusing our attention on a suspect's ability (or inability) to access weapons or destroy evidence at the time a search incident to arrest is conducted.").

Turning to the facts of the present case, at the time the officers searched the bags, Goudreau's hands were handcuffed behind his back. Goudreau was standing with the back of his legs against the long side of the bed. One armed officer stood directly in front of Goudreau, such that Goudreau was sandwiched between the officer and the bed. Agent McPartlin stood at

6

Goudreau's left side and held Goudreau's left arm. In addition to the two officers guarding Goudreau's person, there were two other officers in the bedroom and four additional officers on the scene. The duffle bag was located five to six feet from Goudreau and on the floor by the foot of the bed—that is, around the corner and diagonally across the bed from where Goudreau was standing. The duffle bag was zipped shut. The toiletry bag within the duffle bag was zipped shut as well.

It is conceivable though unlikely that Goudreau (with his hands handcuffed behind his back) could have broken free from the two armed officers guarding his person, lunged five to six feet and around the corner of the bed, and dropped to the floor. It is inconceivable, however, that Goudreau could have done so and then (with his hands still handcuffed behind his back) unzipped the duffle bag, located and unzipped the toiletry bag within the duffle bag, and gained access to a weapon or evidence before being tackled or otherwise stopped by one of the four armed officers in the room.[1] It is similarly inconceivable that Goudreau could have broken free from his handcuffs and then had time to accomplish these tasks before being stopped. Goudreau would have had to possess the qualities of both Houdini and an acrobat in order to accomplish such feats. Considering the totality of the circumstances, the court finds that Goudreau could not

---

[1] See United States v. Tejada, 524 F.3d 809, 812 (7th Cir. 2008) (reasoning that it is "inconceivable" that a handcuffed arrestee who was surrounded by officers could have lunged across a room, opened a cabinet, and unzipped a travel bag without being wrestled to the floor, and further reasoning that it is "inconceivable squared . . . that he could have unzipped not only the blue travel bag but also the bag inside it"); United States v. Myers, 308 F.3d 251, 267 (3d Cir. 2002) (reasoning that the arrestee would have had to possess qualities of both Houdini and an acrobat in order to gain access to the interior of a zipped bag that was three feet from the arrestee when the arrestee was handcuffed, lying face down on the floor, and "covered" by two armed police officers); United States v. Blue, 78 F.3d 56, 60 (2d Cir. 1996) (finding that there was "no possibility" that the arrestees could access the area between the box spring and mattress of a bed where the arrestees were handcuffed behind their backs, prone on the floor, and guarded by officers). Cf. United States v. Nascimento, 491 F.3d 23, 51 (1st Cir. 2007) (affirming the district court's finding that a cabinet eight to ten feet away from an *unrestrained* arrestee was in his immediate control).

have accessed the interior of the duffle bag, much less the interior of the toiletry bag, at the time of the search. Accordingly, the search exceeded the area within Goudreau's immediate control and was not justified as a search incident to arrest.

### b. *Exigent Circumstances*

The Government contends that the warrantless searches of the duffle bag and the toiletry bag located within the duffle bag were justified by exigent circumstances. The Government asserts that the officers reasonably believed that Goudreau posed a danger to the officers and Ms. Levoy. Govt.'s Supp. Mem. 6-7. Goudreau responds that, at the time of the search, he was handcuffed and secured by the officers such that there was "no risk to the safety of officers or anyone else." Def.'s Post-Hearing Mem. 13.

The Government bears the burden of proving exigent circumstances sufficient to justify a warrantless search. United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005). "To show exigent circumstances, the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." Id. (quoting Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999)); see also Kentucky v. King, 131 S.Ct. 1849, 1862 (2011) (reasoning that any warrantless search based on exigent circumstances "must, of course, be supported by a genuine exigency"). Exigent circumstances include "an imminent threat to the life or safety of members of the public, the police officers, or a person located within the residence." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996). "The question here, then, is whether the police had a reasonable basis to believe that a threat to safety existed of an urgency and magnitude that would justify a warrantless search of the kind that occurred." United States v. Lopez, 989 F.2d 24, 26 (1st Cir. 1993).

At the time that the officers searched the bags, Goudreau was handcuffed and secured by

8

multiple officers. As discussed above, Goudreau could not have accessed the interior of the bags at that time. Accordingly, the officers did not have a reasonable basis to believe that Goudreau posed a threat. See United States v. Irizarry, 673 F.2d 554, 559 n.* (1st Cir. 1982) (finding no exigency where six officers had the three defendants under control at the time of the search, and noting that "[t]he fact that a gun was known to be hidden somewhere cannot, by itself, transform the situation into a crisis. A gun is not a bomb; it is dangerous only if a defendant is holding it."); see also United States v. Mallory, 765 F.3d 373, 386-87 (3d Cir. 2014); United States v. Simmons, 661 F.3d 151, 157-58 (2d Cir. 2011). Additionally, there was no basis for the officers to suspect that anyone else was present in the apartment who could have accessed the bags and posed a danger.² Cf. Lopez, 989 F.2d at 26-27 & n.1. In light of the above, the court finds that the Government has not met its burden of proving exigent circumstances sufficient to justify the warrantless search of the bags.

### c. Consent to Search

Finally, the Government contends that Goudreau gave his voluntary consent for the officers to search the duffle bag when—after Goudreau saw a patch for the police department of Ipswich (the town in which his father's gun store was located)—he stated, "I know what this is about; it's in the bag," and gestured with his head towards the duffle bag near the foot of the bed. Goudreau responds that he did not voluntarily consent to the search, but merely acquiesced to the officers' "show of authority" in kicking down the door, entering the apartment with guns drawn, handcuffing him, sweeping the apartment, and searching the sheets on the bed.

"Another exception to the search-warrant requirement is a search by consent." United States v. Winston, 444 F.3d 115, 121 (1st Cir. 2006). "In order to establish this exception, 'the

---

² The Government does not argue, and the record does not support a finding, that the officers had any reason to believe that Ms. Levoy posed a threat to the officers or anyone else.

government must prove valid consent by a preponderance of the evidence.'" Id. (citation omitted). "Consent to a search may be express or inferred." United States v. Reynolds, 646 F.3d 63, 72 (1st Cir. 2011); Winston, 444 F.3d at 122 ("[W]e have found implied-in-fact consent based entirely on silent actions."). "To be valid, a consent to search must of course be voluntary." Winston, 444 F.3d at 121. "The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." Id. (quoting United States v. Miller, 589 F.2d 1117, 1130 (1st Cir. 1978)).

Goudreau's statements and conduct implied his consent for the officers to search the duffle bag and the toiletry bag within the duffle bag. Goudreau's head gesture directed the officers to the bag and demonstrated that he understood that the officers would want not only to know the location of the gun but also to find it as well. Goudreau's conduct would reasonably lead the officers to conclude that he was consenting to a search of the bags. See Reynolds, 646 F.3d at 73 (holding that the district court did not clearly err in finding implied consent for officers to search the headboard of a bed when officers asked defendant if she had any weapons, defendant responded "yes," and defendant gestured towards the headboard); Winston, 444 F.3d at 121-22 (holding that the district court clearly erred by finding that the defendant did not impliedly consent to search of a nightstand when officers asked defendant for identification, defendant told them that his identification was in the nightstand, and defendant gestured to the nightstand with his shoulder).

The voluntariness of that consent "is a question of fact that turns on an evaluation of multiple factors, including the consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent." Reynolds, 646 F.3d at 72-73. "Further considerations include . . . whether the consent was obtained by coercive means." Id. "Although

sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, 'custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search.'" United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (internal citation omitted) (quoting United States v. Watson, 423 U.S. 411, 424 (1976)). "Moreover, it is not essential that the officers inform the consenting party of the right to withhold consent, though knowledge of the right to withhold consent is a factor to be considered in assessing voluntariness." Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). Finally, "valid consent requires more than mere acquiescence in the face of an unfounded claim of present lawful authority." United States v. Brake, 666 F.3d 800, 806 (1st Cir. 2011) (internal quotation marks omitted) (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

Goudreau's unsolicited consent to search the bags was not coerced. At the time that Goudreau directed the officers to the duffle bag, the scene was under control, the officers' guns were holstered, and some of the excitement from the initial entry had passed. See United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (finding the fact that ten to fifteen officers entered the hotel room with guns drawn insufficient to undermine voluntariness of consent). There is no evidence that the officers used any overt or covert tactics or pressure to exact Goudreau's consent. The officers did not, for instance, interrogate or threaten Goudreau. Rather, Goudreau's consent was unprompted.

Significantly, this was not Goudreau's first encounter with law enforcement. Goudreau had been convicted of at least six prior felonies. "It is reasonable to infer that a veteran of the criminal justice system will be 'less likely than most to be intimidated by the agents' show of force.'" United States v. Chaney, 647 F.3d 401, 408 (1st Cir. 2011) (quoting Barnett, 989 F.2d at 556). Goudreau did not act in an intimidated manner; to the contrary, Goudreau initially

questioned the officers as to what was going on and why they were there. See id. Moreover, Goudreau did not appear to be under the influence of drugs or alcohol at that time.

The court further finds that Goudreau's conduct was not a mere acquiescence to a claim of present lawful authority to conduct the search. When Goudreau asked if the officers had a warrant, the officers did not respond. They never represented to Goudreau that they were in possession of a search warrant, or that they could lawfully search the bags without his consent. Cf. Bumper, 391 U.S. at 546-50 (finding consent involuntary when an officer falsely stated that he had a warrant to search the house and the resident said "go ahead"); United States v. Weidul, 325 F.3d 50, 54 (1st Cir. 2003) (upholding involuntariness finding when officer stated "I'm going to look in here," and defended responded "okay"); cf. also United States v. Vazquez, 724 F.3d 15, 22-25 (1st Cir. 2013). The officers' initial search was limited, until the consent was given, to the protective sweep for persons and the search of the bed for weapons incident to arrest. See, e.g., Chaney, 647 F.3d at 407-08 (upholding voluntariness of consent search conducted after protective sweep and frisk for weapons). The record does not reflect that the officers opened any bags or other containers, as might suggest to Goudreau that the officers had the authority to conduct a general search of the apartment or to search bags. Moreover, the officers did not "make any motion or go towards the bag" before Goudreau's statements and gesture. Supp. Hr'g Tr. 15.

Finally, Goudreau's initial request to see a warrant indicates his knowledge, at least to some extent, of the warrant requirement. See Bustamonte, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."). Goudreau may have been uncertain as to whether the officers presently had a search warrant or would subsequently

12

obtain one. Either way, Goudreau's will was not overborne, nor his "capacity for self-determination critically impaired." Id. at 225. Rather, the court finds it more likely that upon seeing the badge for the Ipswich police department, Goudreau realized that his father (to whom Goudreau had recently confessed by text message) had followed through on his threat to report Goudreau to the police for stealing the guns and that the jig was up—he had been caught. See Robbins v. MacKenzie, 364 F.2d 45, 49-50 (1st Cir. 1966) ("[T]he court believed that Albert had concluded that events had caught up with him, and that if he refused entry he would merely be postponing the inevitable. . . . Bowing to events, even if one is not happy about them, is not the same thing as being coerced."); see also United States v. Lace, 669 F.2d 46, 52-53 (2d Cir. 1982) ("The consent to a search by one who realizes that the jig is up and a search warrant will issue in any event is similar to a plea of guilty by one who believes that he will be convicted if he stands trial. . . . His act does not become involuntary simply because the consequences would have been the same if he refused."). Considering the totality of the circumstances, the court finds that Goudreau's consent to search the bags was voluntary; Goudreau's consent was not "coerced by threats or force, or granted only in submission to a claim of lawful authority." Bustamonte, 412 U.S. at 233.[3]

IV.     Conclusion

For the above-stated reasons, the court hereby orders that Goudreau's Motion to Suppress [#35] is DENIED.

/s/ Indira Talwani
Date: April 6, 2015                            United States District Judge

---

[3] Because the court finds that Goudreau consented to the officers' search of the bags, the court need not reach the Government's argument under the inevitable discovery doctrine.